**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RACHEL HALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:17-cv-01268** |
| **THE METROPOLITAN** | ) | **Judge Aleta A. Trauger** |
| **GOVERNMENT OF NASHVILLE AND** | ) | |
| **DAVIDSON COUNTY et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiff Rachel Hall initiated this action by filing a Complaint in the Circuit Court for Davidson County, Tennessee, asserting claims under 42 U.S.C. § 1983 and state law. (Compl., Doc. No. 1.) The case was removed to this court on the basis of federal question jurisdiction. Now pending are four separate Motions to Dismiss filed by the five defendants: the Metropolitan Government of Nashville and Davidson County ("Metro") (Doc. No. 5); Don Aaron (Doc. No. 7); Megan Arnett and Benjamin Winkler (Doc. No. 9); and Elizabeth Berry-Loucks (Doc. No. 12).

The motions have been fully briefed and are ripe for review. For the reasons set forth herein, the motions filed by Berry-Loucks (Doc. No. 12) and by Arnett and Winkler (Doc. No. 9) will be granted in part and denied in part. The motions filed by Aaron (Doc. No. 7) and Metro (Doc. No. 5) will be granted in their entirety.

## I.       Factual and Procedural Background

The facts are taken from the Complaint, and the court accepts the factual allegations as true for the purpose of ruling on the Rule 12(b)(6) motions.

Defendants Arnett, Berry-Loucks, and Winkler are or were at all relevant times employed by Metro as police officers with the Metro-Nashville Police Department. Defendant Aaron is or was employed by Metro as the Police Department Public Affairs Manager.

Rachel Hall returned to her apartment in Antioch, Tennessee in the early morning hours of Tuesday, August 16, 2016, after having been out of town for a few days. Metro police officers, including Arnett, Berry-Loucks, and Winkler, among others, were at her apartment when she arrived. Prior to Hall's arrival, the police officers had already "bagged and tagged" all contraband found in the apartment, or on individuals in the apartment, and had placed several individuals, most of whom were in her apartment without Hall's knowledge or permission, under arrest for possession of drug contraband. (Compl. ¶ 14.)

Upon approaching the premises to inquire why the police were on the scene, Hall was handcuffed and "shoved" into her apartment. (Compl. ¶ 15.) Hall offered no resistance to her rough treatment by the officers and was compliant with the officers' commands. Hall was taken to the bedroom of her residence so that Berry-Loucks and Arnett, the two female officers on the scene, could search her person. Berry-Loucks violently grabbed Hall and began to search her. Berry-Loucks did not give any commands or ask any questions as she began her search.

While conducting the search, Berry-Loucks found a syringe in Hall's bra, which she removed by the plastic plunger end. After retrieving the syringe, Berry-Loucks cursed at Hall and screamed at her that she "could have" been injured by the syringe. (Compl. ¶ 20.) Berry-Loucks then hit Hall across the face with such force that Hall fell backwards onto the bed. Hall

"experienced great physical pain" as a result of being struck. (Compl. ¶ 21.) Berry-Loucks pulled Hall off of the bed and hit her again in the face, causing further pain and causing Hall to lose her balance.

Thereafter, while Hall "begged" her to "stop hitting her," Berry-Loucks "turned her around, pushed her face-down over the bed, and . . . began a violent digital search of Ms. Hall's vagina." (Compl. ¶ 23.) "Using her fingers, Defendant Berry-Loucks digitally penetrated Ms. Hall's vagina at least five times conducting an 'on-scene cavity search,' without probable cause or a subpoena." (Compl. ¶ 24.) Defendant Megan Arnett was present during this assault and "observed the entire ordeal" but "did not verbally or physically intervene." (Compl. ¶ 29.) The plaintiff alleges that Arnett "had both the opportunity and means to prevent the harm to Ms. Hall." (Compl. ¶ 30.)

Hall's hands were handcuffed behind her back during this entire event. She had exhibited no threatening or aggressive behavior toward any of the police officers at the scene and had been fully compliant with the officers' verbal commands.

At some point, several male police officers entered the room, and the assault by Berry-Loucks terminated. After some discussion, one or more unknown officers contacted detectives with the Division of Sex Crimes to talk to Hall. Hall was transported to Nashville General Hospital where she was interviewed and given a sexual assault examination.

After this incident, Berry-Loucks was decommissioned, assigned to desk duty, and issued a misdemeanor citation for "slapping" Hall. (Compl. ¶ 35.)

While Hall was being treated at General Hospital, defendant Don Aaron, as Public Affairs Manager for Metro Police Department, issued a press release ("the Press Release") which, Hall claims, contained untrue statements, including that Berry-Loucks was "stuck" with

the syringe, that she had merely "slapped" Hall, and that Hall was in possession of other items of contraband that the defendants knew had never been in her possession. (Compl. ¶ 36.) It was published along with a "mug shot" photograph. Hall alleges that the photograph was republished by other media outlets, causing her humiliation and emotional distress. (Compl. ¶ 37.) She asserts, "upon information and belief," that Aaron "knew or recklessly disregarded the false and misleading nature of the information published in the press release and the false light [in] which said release depicted Ms. Hall." (Compl. ¶ 38.)

Hall claims that Arnett "knowingly and deliberately, or with a reckless disregard for the truth, completed three arrest warrant affidavits" charging Hall with a felony drug offense, possession of a firearm, and criminal simulation. (Compl. ¶ 39.) Similarly, she alleges that Winkler "knowingly and deliberately, or with a reckless disregard for the truth," swore out an arrest warrant charging her with possession of a legal drug without a prescription, unlawful use of drug paraphernalia, and theft of merchandise. (Compl. ¶ 40.) Hall was not charged with possession of the syringe, and all charges against her were subsequently dismissed.

The Complaint purports to assert claims under 42 U.S.C. § 1983, based on violations of the plaintiff's rights under the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution. Hall's claims against Metro are premised upon (1) an alleged custom or practice of permitting police officers to perform "on-scene cavity searches" (Compl. ¶ 42); (2) an alleged custom or practice authorizing the use of excessive force; (3) a failure to supervise or train the individual defendants amounting to deliberate indifference to the plaintiff's constitutional rights; and (4) inadequate and constitutionally deficient hiring procedures. She asserts that the Metro Nashville Police Department is biased toward people of low socioeconomic status and that the conduct complained of is the result of such bias. (Compl. ¶

65.) She also brings claims against Metro under the Tennessee Governmental Tort Liability Act for negligence and false imprisonment. (Compl. ¶¶ 79–85.)

Broadly construed, the Complaint asserts claims against Berry-Loucks and Arnett in their individual capacities under § 1983, based on excessive force, false imprisonment, false arrest, and malicious prosecution, as well as state-law claims for assault and battery, false imprisonment, false arrest, and malicious prosecution. The Complaint likewise asserts claims against Winkler under federal and state law for false imprisonment, false arrest, and malicious prosecution. The Complaint purports to state claims against the police officers involved in Hall's detention in both their individual and official capacities.

The claim against Aaron is premised solely on the Press Release, which the plaintiff contends resulted in false light invasion of privacy in violation of Tennessee law.

The defendants have now filed Motions to Dismiss, along with supporting Memoranda, seeking dismissal of all claims against them. (Doc. Nos. 5–10, 12–13.) The motions are premised upon Rule 12(b)(6) of the Federal Rules of Civil Procedure and the doctrine of qualified immunity. The plaintiff has filed a Response in opposition to each motion. (Doc. Nos. 19–22.)

## II.    Legal Standards

### A.    Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds

upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action"; instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**B.      Section 1983 and Qualified Immunity**

Section 1983 provides "a cause of action for deprivation under color of state law, of any rights, privileges or immunities secured by the Constitution or laws of the United States." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940–41 (6th Cir. 2010) (internal quotation marks and citation omitted). However, "[u]nder the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In resolving a government official's claim to qualified immunity, the court must "look to whether (1) the facts that the plaintiff has alleged or shown establish the violation of a constitutional right, and (2) the right at issue was 'clearly established' at the time of the alleged misconduct." *Stoudemire v. Mich. Dep't of Corrs.*, 705 F.3d 560, 567 (6th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232

(2009)). The district court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

The "key determination" is whether the defendant who claims qualified immunity "was on notice that his alleged actions were unconstitutional." *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009). The Supreme Court has stressed that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.* Rather, it means that, "in light of pre-existing law[,] the unlawfulness must be apparent." *Id.* (collecting cases); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

A defendant bears the initial burden of putting forth facts suggesting that she was acting within the scope of her discretionary authority. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). The ultimate burden of proof, however, is on the plaintiff to show that the defendant is not entitled to qualified immunity. *Id.*

## III.     Don Aaron's Motion to Dismiss

### A.     The Parties' Positions

Hall asserts only one claim against defendant Don Aaron, the Police Department Public Affairs Manager: false light invasion of privacy under Tennessee law.

The Tennessee Supreme Court expressly recognized the separate tort of false light invasion of privacy in 2001. It initially defined the tort as set forth in the Restatement (Second) of Torts:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> > (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> >
> > (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 643–44 (Tenn. 2001) (quoting Restatement (Second) of Torts § 652E (1977)). The court determined, however, that the appropriate standard for false light invasion of privacy claims asserted by a private plaintiff regarding a matter of private concern is "simple negligence." *Id.* at 648. "For all other false light claims," in particular those asserted by a plaintiff who is a public official or public figure, or for claims asserted by a private individual about a matter of public concern, the "actual malice" standard applies. *Id.* at 647–48.

Literal truth is generally not a defense in a false light claim:

> The facts may be true in a false light claim. However, the angle from which the facts are presented, or the omission of certain material facts, results in placing the plaintiff in a false light. Literal accuracy of separate statements will not render a communication "true" where the implication of the communication as a whole was false. . . . The question is whether [the defendant] made discrete presentations of information in a fashion which rendered the publication susceptible to inferences casting [the plaintiff] in a false light.

*West*, 53 S.W.3d at 645 n.5 (alterations in original; internal quotation marks and citations omitted). "Thus, the falsehood involved in a false light action 'may consist in dissemination of matters which, while technically true, give an objectionably false impression where the communicator fails to modify the basic statement with amplifying facts which modify the

statement to create a less objectionable impression corresponding to full reality.'" *Eisenstein v. WTVF-TV, News Channel 5 Network, LLC*, 389 S.W.3d 313, 318 (Tenn. Ct. App. 2012) (quoting Russell G. Donaldson, Annotation, False Light Invasion of Privacy—Cognizability and Elements, 57 A.L.R.4th 22, § 13 (Cum. Supp. 2012)). There are, however, defenses to the claim. The *West* court held that the "absolute and conditional privileges" established by Sections 652F– G of the Restatement (Second) of Torts, which apply to defamation, also apply to false light invasion of privacy. One of these privileges is the "fair report privilege." *Eisenstein*, 389 S.W.3d at 323.

> Hall alleges that Aaron violated her privacy when he:
>
> (1) failed to mention the other people charged at the scene in the press release, (2) announced that the drugs, which were found on other specific individuals who were never alluded to or named in the press release, were in the sole possession of the Plaintiff, (3) omitted from his press release the fact that Plaintiff arrived at the residence after others had been detained, arrested and all contraband secured (the only item on Plaintiff's person was a syringe which she was not charged with possessing), (4) did not disclose in the release that the guns, drugs and other items seized at the scene were already attributed to the other individuals prior to Plaintiff making the scene, and (5) Defendant Aaron disseminated false information in the press release stating that Officer Berry-Loucks was "stuck by an uncapped syringe concealed in the woman's bra."

(Doc. No. 21, at 7.)

For his part, Aaron contends that the false light claim against him should be dismissed because: (1) the alleged police misconduct and criminal activity are matters of public concern, and Hall has not adequately pleaded actual malice; (2) Hall has not adequately pleaded actual damages; (3) Aaron is entitled to qualified immunity; and (4) the fair report privilege applies.

Because the Complaint does not adequately plead malice, the court finds, as set forth below, that the claim is subject to dismissal for failure to state a claim for which relief may be granted.

### B.     Actual Malice—The Press Release

In response to the Motion to Dismiss, Hall concedes that the matter is "likely" one of public concern and that the actual malice standard applies. (Doc. No. 21, at 8.) The court finds that the plaintiff's arrest on drug charges is a matter of public concern. *Accord* Restatement (Second) of Torts § 652D cmt. f ("Those who commit crime or are accused of it . . . are nevertheless persons of public interest, concerning whom the public is entitled to be informed."), *quoted in Armstrong v. NBC Universal Inc.*, No. 1:11CV-P67-M, 2012 WL 4098984, at *4 (W.D. Ky. Sept. 17, 2012), *aff'd* (6th Cir. Oct. 31, 2013). Matters "customarily regarded as 'news'" typically are within "the scope of legitimate public concern." Restatement (Second) of Torts § 652D cmt. g; *see also id.* ("Authorized publicity includes publications concerning homicide and other crimes, arrests, police raids . . . and many other similar matters of genuine, even if more or less deplorable, popular appeal."). Thus, the actual malice standard applies.

"'[T]he term 'actual malice' refers to the publication of a statement with knowledge of falsity or with reckless disregard as to truth or falsity.' It is a subjective standard." *Eisenstein v. WTVF-TV* ("*Eisenstein II*"), No. M2015-00422-COA-R3-CV, 2016 WL 2605752, at *5 (Tenn. Ct. App. May 3, 2016) (quoting *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 300 (Tenn. Ct. App. 2007), and citing *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)).

The Press Release states in full as follows:

South Precinct Officer Elizabeth Berry-Loucks has been decommissioned and assigned to desk duty after she was arrested by citation today on a charge of misdemeanor assault.

Berry-Loucks, while conducting a 5 a.m. search of a woman under arrest on felony heroin and gun charges, was stuck by an uncapped syringe concealed in the woman's bra. She is alleged to have immediately reacted by slapping the suspect in the face with her open hand.

> Rachel E. Hall, 22, is charged with possession of heroin for resale, felony theft, possession of pills without a prescription, unlawful use of drug paraphernalia, and violation of Tennessee's Crooks with Guns law. She is jailed in lieu of $25,000 bond. Recovered from Hall's . . . apartment were 9.5 grams of heroin, 2.9 grams of cocaine, 112 miscellaneous pills in baggies, and 3 pistols (2 of which were reported stolen in Hermitage-area burglaries).

> Berry-Loucks, who sought medical treatment for the needle stick, is a three-year veteran of the MNPD. The Office of Professional Accountability is conducting an administrative investigation of her actions early today.

(Doc. No. 7-1.) The Press Release includes a photograph of Berry-Loucks and a "mug shot" of Hall. (*See id.*; Compl. ¶ 37.)

Hall avers that Aaron had access to all of the facts of the incident prior to issuing a public statement and, specifically, that he knew or should have known that the plaintiff's complaint about Berry-Loucks was of a sexual nature and not related solely to her being struck in the face and that the contraband mentioned in the release was found on other individuals. She claims that his knowledge of these facts is sufficient to demonstrate actual malice.[1]

Notably, however, Hall does not actually attack the veracity of most of the statements made in the Press Release. Rather, she contends that the statements are one-sided, as they do not contain the entire story from a balanced perspective. Regarding the first paragraph, which truthfully states that Berry-Loucks had been decommissioned and charged with misdemeanor assault, the plaintiff complains that there is no mention that the assault was a sexual assault. That conduct, however, relates to Berry-Loucks' conduct, not the plaintiff's. It does not cast the plaintiff in any particular light.

---

[1] The court construes the plaintiff's Response very generously as positing that argument. In fact, the numerous errors, omissions, and sentence fragments in the document submitted by the plaintiff in response to Aaron's Motion to Dismiss seem to indicate that the document is a preliminary draft that was not properly edited or proofread.

The second paragraph, according to Hall, contains an untrue statement: that Berry-Loucks was pricked by an uncapped syringe. Hall, however, does not contest the fact that she was carrying an uncapped syringe in her bra. The question of whether Berry-Loucks was or was not pricked with it does not actually affect the fact that Hall was carrying an uncapped syringe in her bra. That act alone casts her in a certain light that is not mitigated or worsened depending on whether the searching officer was stuck with it.

Hall does not contend that the third paragraph of the Press Release contains any untrue statement; she was charged with those crimes, and the items listed were recovered from her apartment or from searches of people in her apartment. She complains, however, that there was no mention of the fact that most of the paraphernalia found in her apartment was attributed to other people and that the charges against her were unfounded. At the time the Press Release was issued, the charges had not been dropped, however, so the Press Release was factually true. It did not present Hall's version of events, but it did not speculate as to Hall's guilt or innocence either. Although it did not mention the arrests of the other individuals, that omission does not mean that it "made discrete presentations of information in a fashion which rendered the publication susceptible to inferences casting [Hall] in a false light." *West*, 53 S.W.3d at 645 n.5. Additional information about other individuals would not have changed the light in which the Press Release cast Hall, and none of the information reported *about Hall* was inaccurate or incomplete as of the time the Press Release was issued.

Hall objects to the final paragraph because Berry-Loucks, according to Hall, had no reason to seek medical assistance, and there is no mention of Hall's allegations that Berry-Loucks sexually assaulted her. Again, however, these statements pertain only to Berry-Loucks' conduct and do not cast Hall in any particular light.

In sum, the Press Release itself does not contain any untrue statements *about* the plaintiff, and the plaintiff's primary complaint about it seems to be that the light in which it cast *Berry-Loucks* was not as unflattering as it should have been. Moreover, the sole basis for Hall's contention that Aaron "knew or recklessly disregarded the false and misleading nature of the information published in the Press Release and the false light in which said release depicted Ms. Hall" is Hall's own "belief," supported only by unspecified "information." (Compl. ¶ 38.) Aaron argues that the plaintiff's "belief" that Aaron acted with malice, without any factual basis for such belief, is not sufficient to plead a plausible claim that he acted with actual malice.

The court agrees. "To survive a motion to dismiss, a complaint must plead 'facts' that create a 'plausible inference' of wrongdoing." *In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 682). "The mere fact that someone believes something to be true does not create a plausible inference that it is true." *Id.*; *see also Twombly*, 550 U.S. at 551 (finding the factual averments in a complaint to be insufficient where the plaintiffs "allege[d] upon information and belief that [the defendants] ha[d] entered into a contract, combination or conspiracy to prevent competitive entry"); *16630 Southfield Ltd. P'ship v. Flagstar Bank*, 727 F.3d 502, 506 (6th Cir. 2013) (finding a series of "upon information and belief" claims insufficient, because the plaintiffs "have merely alleged their 'belief,'" noting: "These are precisely the kinds of conclusory allegations that *Iqbal* and *Twombly* condemned and thus told us to ignore when evaluating a complaint's sufficiency."). The Complaint here contains no facts suggesting that Aaron actually knew or had any basis for knowing that Berry-Loucks had not been stuck with the uncapped syringe or that the plaintiff had been wrongfully charged. The factual allegations in the Complaint do not support an

inference of malice, so the false light invasion of privacy claim based on the publication of the Press Release is subject to dismissal.

### C.     The Mug Shot

Aaron's Memorandum in support of his Motion to Dismiss does not contain any argument addressing the publication of Hall's mug shot, and the plaintiff does not expressly address it either. The court nonetheless finds that the matter bears separate mention.

The Sixth Circuit has recently acknowledged that the "common law recognizes no invasion-of-privacy tort remedy for publicizing facts in the public record" and that "booking photos form part of the public record." *Detroit Free Press Inc. v. United States Dep't of Justice*, 829 F.3d 478, 483 (6th Cir. 2016) (citing Restatement (Second) of Torts § 652D cmt. b and cmt. f, illus. 13); *see also id.* at 489–90 (Boggs, J., dissenting) (quoting the Restatement (Second) of Torts § 652D cmt. f and ill. 13, noting that "the common law did not, and does not now, recognize an indicted defendant's interest in preventing disclosure of his booking photograph during ongoing criminal proceedings"). Because publication of a mug shot cannot give rise to an invasion of privacy, that portion of the plaintiff's claim premised on the publication of her mug shot is also subject to dismissal.

In sum, Don Aaron's Motion to Dismiss will be granted, and the claims against him will be dismissed in their entirety.

## IV.     Berry-Loucks' Motion to Dismiss

The Complaint asserts claims against Berry-Loucks under § 1983 based on the use of excessive force. It also asserts claims for false imprisonment, false arrest, and malicious prosecution under both § 1983 and state law, and state-law claims for assault and battery.

Defendant Berry-Loucks seeks dismissal of all of the claims against her on the basis that (1) the Complaint, "[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct . . . fails to give each defendant fair notice of what the Plaintiff[']s claim is and the ground upon which it rests" (Doc. No. 13, at 4); (2) she is protected by the doctrine of qualified immunity from the excessive force claim; (3) any official capacity claim against her must be dismissed because, as a police officer, Berry-Loucks is a state official, and suing a state official in her official capacity is tantamount to suing the state itself; (4) the allegations in the Complaint fail to establish violations of the Fourth, Fifth, Eight, or Fourteenth Amendment to the United States Constitution; and (5) the claims of assault and battery, false arrest, false imprisonment, and malicious prosecution fail as a matter of law. The court addresses each of these arguments, though not necessarily in the order raised, and finds that Berry-Loucks' motion should be granted in part and denied in part.

### A.    Generalized Pleading

While it is true that a Complaint must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the claims in this case do not fail as a result of overly generalized pleading. The case upon which the defendant relies, *Marcilis v. Township of Redford*, 693 F.3d 589, 695 (6th Cir. 2012), involved a "generalized pleading that refers to all defendants generically and categorically." Here, however, the Complaint includes a fairly detailed factual section, identifying with some specificity which acts were committed by which defendants. That the "Cause of Action" sections of the Complaint are somewhat general does not doom the Complaint as a whole, where the factual allegations themselves are adequate to put the defendants on notice of what specific conduct the plaintiff challenges. *Accord Lanman v. Hinson*,

529 F.3d 673, 684 (6th Cir. 2008) ("This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, *facts that demonstrate what each defendant did* to violate the asserted constitutional right." (emphasis added)).

### B.     Official Capacity Claims

Berry-Loucks argues that police officers are state officials and that the claims against her in her official capacity, since they are equivalent to claims against the state, must be dismissed under *Will v. Michigan Department of State Police*, 491 U.S. 58, 64 (1989). The state, of course, is immune from suit for damages, unless it has waived sovereign immunity or consented to suit. *Id.* at 66. Berry-Loucks, however, has not cited to any Tennessee law supporting her assertion that she was a state official, as opposed to a Metro employee, at the relevant time. In fact, the other police officer defendants, who, like Metro, are represented by attorneys with the Metropolitan Nashville Legal Department, acknowledge that they are, instead, Metro employees, not state officials. (Doc. No. 10, at 6–7.) Moreover, Tennessee precedent uniformly suggests that Metro police officers are Metro employees rather than state officials. *See, e.g.*, *Timmons v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2006-01828-COA-R3-CV, 2007 WL 2406132, at *5 (Tenn. Ct. App. Aug. 23, 2007) (finding that Metro could be liable under Tennessee Governmental Tort Liability Act for the negligent acts of Metro Police Officers).

Regarding municipal liability under § 1983, the Sixth Circuit has explained:

[A] § 1983 individual-capacity claim differs from a § 1983 official-capacity claim. An official-capacity claim against a person is essentially a claim against the municipality [that employs her]. On the other hand, an individual-capacity claim seeks to hold an official personally liable for the wrong alleged. On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right[.] However, [m]ore is required in an official-capacity action. . . . [T]he entity's policy or custom must have played a part in the violation of federal law.

*Peatross v. City of Memphis*, 818 F.3d 233, 240–41 (6th Cir. 2016) (alterations in original; internal quotation marks and citations omitted).

Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978). Thus, an official capacity claim against an individual "is, in all respects other than name, to be treated as a suit against the [governmental] entity" of which the officer is an agent. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "It is *not* a suit against the official personally, for the real party in interest is the entity." *Id.* Where the entity itself is named as a defendant, an official capacity claim is redundant. *Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014); *Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 327 (6th Cir. 2013).

Consequently, district courts within the Sixth Circuit frequently dismiss as superfluous official capacity claims brought in suits where the municipal entity is also named as a defendant. *See, e.g.*, *Epperson v. City of Humboldt, Tenn.*, 140 F. Supp. 3d 676, 683 (W.D. Tenn. 2015) (citing *Buckner v. Roy*, Case No. 2:15-cv-10441, 2015 WL 4936694, at *6 (E.D. Mich. Aug. 18, 2015); *Horn v. City of Covington*, No. 14-73-DLB-CJS, 2015 WL 4042154, at *3 (E.D. Ky. July 1, 2015)).

The plaintiff here clearly seeks to hold each police officer defendant personally liable for his or her own conduct—that is, in their individual capacities—but she also asserts separate policy-or-custom claims against Metro. Because Metro is named as a defendant in this case, and the Complaint asserts "policy or custom" claims against it under § 1983, the official capacity claims against the individual officer defendants will be dismissed without prejudice as superfluous. This analysis applies to the official capacity claims against Berry-Loucks, Arnett, and Winkler.

C.      **Excessive Force**

1.      *Which Amendment Is Implicated?*

The Complaint itself purports to state claims for violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments. The defendants argue that only the Fourth Amendment is implicated by the plaintiff's excessive force claims. The plaintiff appears to argue that both the Fourth and Fourteenth Amendments apply. (*See* Doc. No. 19, at 8–9.) The law is clear: only the Fourth Amendment applies.

The Sixth Circuit recognizes that "[w]hich amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between." *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008) (citations omitted). If the plaintiff is "a convicted prisoner at the time of the incident, then the Eighth Amendment deliberate indifference standard sets the standard for an excessive force claim." *Id.* The plaintiff was not convicted at the time of the events in question, and no one argues now that the Eighth Amendment's standard applies. Likewise, the plaintiff concedes that the Fifth Amendment, which applies only to federal officials, does not apply. *See Scott v. Clay Cnty.*, 205 F.3d 867, 873 n.8 (6th Cir. 2000) ("[T]he Fifth Amendment's Due Process Clause circumscribes only the actions of the federal government.").

"[I]f the plaintiff was a free person, and the use of force occurred in the course of an arrest or other seizure, then the plaintiff's claim arises under the Fourth Amendment and its reasonableness standard." *Lanman*, 529 F.3d at 680 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). In *Graham*, the Supreme Court held that "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard,

rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395. The Fourteenth Amendment's substantive due process protections apply to pretrial detainees. *See Lanman*, 529 F.3d at 680 ("The Fourteenth Amendment is the source of a pretrial detainee's excessive force claim because when a plaintiff is not in a situation where his rights are governed by the particular provisions of the Fourth or Eighth Amendments, the more generally applicable Due Process Clause of the Fourteenth Amendment provides the individual with protection against physical abuse by officials.").

The plaintiff here was detained by police officers in the course of an arrest and a search incident to arrest when the alleged use of excessive force occurred. The Sixth Circuit has held that the Fourth Amendment standard extends "at least through the completion of the booking procedure, which is typically handled by jailers." *Burgess v. Fischer*, 735 F.3d 462, 474 (6th Cir. 2013). The plaintiff was not yet a pretrial detainee when the events giving rise to her claims occurred. The Fourth Amendment therefore applies to her § 1983 claims.

### 2. Qualified Immunity and Excessive Force

To determine whether qualified immunity applies in a given case, the federal courts use a two-step analysis: first, viewing the facts in the light most favorable to the plaintiff, the court determines whether the allegations give rise to a constitutional violation; and second, the court assesses whether the right was clearly established at the time of the incident. *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 786 (6th Cir. 2012); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court can consider these steps in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As indicated above, the plaintiff's excessive force claim is governed by the Fourth Amendment. Under the Fourth Amendment, courts apply an "objective reasonableness" test, looking to the reasonableness of the force in light of the totality of the circumstances confronting

the defendants and not to the defendants' underlying intent or motivation. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004); *see also Graham*, 490 U.S. at 396–97. The court must balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466–67 (6th Cir. 2006). Three factors guide this balancing: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396). These factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight. *Graham*, 490 U.S. at 396–97.

Applying these factors here, the crimes with which the plaintiff was charged were fairly serious, including possession of drugs with intent to sell and unlawful possession of a weapon. However, the plaintiff maintains that these charges, which were later dismissed, were entirely unwarranted. And the facts as alleged in the Complaint indicate that Hall did not pose any threat to the officers' safety and was not resisting or attempting to evade arrest. According to Hall, she complied with every demand by the police officers who arrested and then searched her.

Moreover, if Hall's version of events is true, the use of force was unwarranted and employed in a vengeful fashion. Hall alleges that Berry-Loucks "gave no commands and asked no questions as she began her search." (Compl. ¶ 18.) She acknowledges that she had a syringe concealed in her bra, but she claims that Berry-Loucks was not stuck with it. Berry-Loucks nonetheless struck her twice across the face, hard enough to knock her down and to cause pain, purely out of anger. Hall also alleges that the clothed "cavity search" was both unauthorized and

unnecessarily violent. Berry-Loucks contests the plaintiff's allegations on a factual level, claiming, contrary to Hall's allegations, that she was actually "pricked by the syringe concealed in the bra of the suspected drug offender" and that Hall had falsely informed her, prior to the search that "she had no sharp objects on her person." (Doc. No. 13, at 9.) Of course, for purposes of a motion to dismiss, the court must accept as true the well pleaded factual allegations in the Complaint. Berry-Loucks also insists that she merely conducted a pat-down incident to a lawful arrest, believed she was following protocol, and "did not take any action with malicious intent." (Doc. No. 13, at 6.) The defendant's intent, however, is irrelevant: "In evaluating whether a police officer used excessive force on a particular occasion, the court must view the situation from the perspective of a reasonable officer on the scene at the time and without the benefit of 20/20 hindsight." *Smith v. City of Troy, Ohio*, 874 F.3d 938, 943–44 (6th Cir. 2017). Moreover, a pat-down incident to arrest does not typically include blows to the face or a search of body cavities. If a jury believes Hall's version of events as set forth in the Complaint, it could conclude that the use of force was unreasonable under the totality of the circumstances and, therefore, that it violated Hall's rights.

Having reached that conclusion, the court must then consider whether that right was clearly established when the arrest occurred. *See Martin*, 712 F.3d at 960. The Sixth Circuit answers that question in the affirmative: "[C]ases in this circuit clearly establish the right of [persons] who pose no safety risk to the police to be free from gratuitous violence during arrest." *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 608 (6th Cir. 2006) (quoting *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006)); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) ("We have . . . consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly

established right."); *Meirthew v. Amore*, 417 F. App'x 494, 499 (6th Cir. 2011) ("[I]t is unreasonable to use significant force on a restrained subject, even if some level of passive resistance is presented."); *Lustig v. Mondeau*, 211 F. App'x 364, 369–71 (6th Cir. 2006) (gratuitously causing pain to a "nonviolent and, at most, passively resistant detainee" violated clearly established law).

Because it was clearly established that the use of force on a non-resistant, compliant individual may constitute excessive force, and because a reasonable jury could find that Hall posed little or no threat based on the facts alleged, Berry-Loucks is not entitled to qualified immunity with respect to the excessive force claim.

### D.     Civil Assault and Battery

"Under Tennessee law, a police officer can be liable for 'damages caused by his excessive and unprivileged use of force under the intentional tort of battery.'" *Stafford v. Jackson Cnty.*, No. M2016-01883-COA-R-3CV, 2017 WL 3332268, at *4 (Tenn. Ct. App. Aug. 4, 2017) (quoting *City of Mason v. Banks*, 581 S.W.2d 621, 626 (Tenn. 1979)). In making an arrest, a police officer is "privileged to use only that force necessary to effect the arrest," while also "maintaining his own personal safety and that of others present." *Id.* at 625–26. Tennessee courts apply the same "excessive force" analysis in assault and battery claims as federal courts in § 1983 claims for excessive force. *Harris v. Metro. Gov't of Nashville*, No. 3:06–0868, 2007 WL 4481176, at *9 (M.D. Tenn. Dec. 18, 2007). As the court has already found that the Complaint states a colorable claim under § 1983 for the use of excessive force, the factual allegations also support state-law assault and battery claims. *Accord Stafford*, 2017 WL 3332268, at *5 (denying summary judgment on the plaintiff's assault and battery claim based on the defendant police officer's alleged use of excessive force in handcuffing the plaintiff).

### E.     False Arrest and False Imprisonment

Berry-Loucks asserts, without supporting caselaw or, indeed, any legal argument, that the "false arrest, false imprisonment and malicious prosecution claims fail as a matter of law and should be dismissed." (Doc. No. 13, at 13.) Despite the lack of relevant argument by the defendant, the court finds that the Complaint fails to allege sufficient facts to state false arrest or false imprisonment claims against her.

The plaintiff does not clarify whether she brings the false arrest and false imprisonment claims under federal or state law. The court presumes them to be brought under both. *See Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005) ("False arrest claims can be brought under either federal or state law."). Claims of false arrest and false imprisonment under § 1983 overlap, with false arrest being a species of false imprisonment. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "A false arrest claim under federal law requires a plaintiff to prove that *the arresting officer lacked probable cause* to arrest the plaintiff." *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) (emphasis added). In considering whether an arresting officer had probable cause to effect the arrest, the court must "consider the totality of the circumstances and whether the facts and circumstances of which [the arresting officer] had knowledge at the moment of the arrest were sufficient to warrant a prudent person . . . in believing . . . that the seized individual ha[d] committed . . . an offense." *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010) (alterations in original; internal quotation marks and citations omitted). Similarly, under Tennessee law, the concepts of false arrest and false imprisonment overlap, and both require a lack of probable cause to effect the detention. *See, e.g.*, *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 54 (Tenn. Ct. App. 2013) ("To successfully prosecute a claim of false arrest and imprisonment, the plaintiff must prove '(1) the detention or restraint of

one against his will and (2) the unlawfulness of such detention or restraint.'" (quoting *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990)); *id.* ("False imprisonment is the intentional restraint or detention of another without just cause," that is, "without probable cause.").

According to the allegations in the Complaint, Hall was returning to her apartment during the early morning hours of Tuesday, August 16, 2017. When she arrived, numerous police officers were already on the scene. She approached to ask why and, "without any probable cause," the police handcuffed her and took her inside. (Compl. ¶ 13.) While these allegations might be sufficient to state a claim for false arrest against *someone*, Hall does not indicate who the arresting officers were. It appears from the allegations in the Complaint that Hall's encounter with Berry-Loucks did not occur until she was taken into the bedroom to be searched, after she had already been handcuffed and detained. Because Berry-Loucks is not alleged to have participated in the actual arrest, the false arrest claim against her must be dismissed. *Accord Zavatson v. City of Warren, Mich.*, No. 16-2338, 2017 WL 4924673, at *6 (6th Cir. Oct. 31, 2017) ("At the outset, Zavatson's false-arrest claims . . . must fail, as Zavatson has not shown that either [defendant] was an 'arresting officer.'").

Insofar as the plaintiff might intend to assert a false imprisonment claim against Berry-Loucks based on the detention that took place after the initial arrest, the Complaint does not allege facts suggesting that Berry-Loucks had any reason to believe that the original arrest was effected without probable cause or, as a result, that the continued detention and a search incident to arrest were improper. In that regard, the caselaw is clear that "a law enforcement officer is generally entitled to rely upon a fellow officer's findings." *See Sutherland v. Mizer*, 625 F. Supp. 2d 492, 500 (E.D. Mich. 2008) (citing *Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ("[P]olice

officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause.").

The court therefore finds that the Complaint fails to state a claim against Berry-Loucks for false arrest or false imprisonment, under state or federal law.

### F.     Malicious Prosecution

The tort of malicious prosecution, like that of false imprisonment, may arise under both federal and state law. The Sixth Circuit has defined the elements of a malicious prosecution claim under the Fourth Amendment as including: (1) that the defendant made, influenced, or participated in the decision to initiate a criminal prosecution against the plaintiff; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a "deprivation of liberty," apart from that caused by the initial arrest, as a consequence of the legal proceeding; and (4) the criminal proceeding must have been resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010) (citations omitted). Similarly, Tennessee law requires a showing that the defendant initiated a suit against the plaintiff without probable cause and that the prior suit terminated in the plaintiff's favor. *Himmelfarb v. Allain*, 380 S.W.3d 35, 38 (Tenn. 2012).

Here, the Complaint does not allege that Berry-Loucks had any participation in the decision to pursue criminal charges against Hall. The malicious prosecution claim against Berry-Loucks will be dismissed for failure to state a claim for which relief may be granted.

### G.     Conclusion: Berry-Loucks' Motion to Dismiss

As set forth above, Berry-Loucks' Motion to Dismiss will be granted in part and denied in part. The Complaint alleges sufficient facts to support a claim under 42 U.S.C. § 1983 against

Berry-Loucks, in her individual capacity, based on the use of excessive force in violation of the plaintiff's rights under the Fourth Amendment. The same facts support state-law assault and battery claims. The official capacity § 1983 claims against Berry-Loucks will be dismissed as redundant of the claims against Metro, and all claims premised upon violations of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution will be dismissed, since the plaintiff's claims are clearly premised on a violation of the Fourth Amendment. The false arrest, false imprisonment, and malicious prosecution claims under federal and state law will be dismissed under Rule 12(b)(6) for failure to state a claim against Berry-Loucks for which relief may be granted.

## V.     Arnett and Winkler's Motion to Dismiss

Arnett and Winkler argue that (1) the official capacity claims against them are redundant of the claims against Metro and should be dismissed as superfluous; (2) the Fourth Amendment applies to the plaintiff's § 1983 claims, requiring dismissal of any claims asserted under the Fifth, Eighth and Fourteenth Amendments; and (3) the Complaint fails to allege sufficiently specific facts to establish the personal involvement and liability of each individual defendant, as a result of which the claims must be dismissed under Rule 12(b)(6).

The court has already determined, above, that the official capacity claims must be dismissed and that the Fourth Amendment standard governs review of the plaintiff's claims. The court considers the viability of each of the remaining claims separately.

### A.     Excessive Force

The Complaint does not allege any facts suggesting that defendant Winkler engaged in the use of excessive force or, indeed, that he had any contact with Hall. To the extent that the plaintiff intended to state a claim against him for excessive force, that claim will be dismissed.

The question of whether the Complaint states a claim against Arnett based on the use of excessive force is more complicated. The plaintiff alleges that Arnett was present and observed Berry-Loucks while she assaulted and "digitally penetrated" the plaintiff's (clothed) vagina "at least five times." (Compl. ¶¶ 24, 29.) The plaintiff alleges "[u]pon information and belief" that "Arnett observed or had reason to know that excessive force was being used against Ms. Hall and had both the opportunity and means to prevent the harm to Ms. Hall," but that Arnett "failed to intervene" while Berry-Loucks "subject[ed] the Plaintiff to excessive force and an illegal search." (Compl. ¶¶ 30, 31.)

Generally, to prove excessive force, the plaintiff must show that the defendant "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). The plaintiff does not allege facts suggesting that either of the first two options applies here. With respect to the third, "a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Id.*

In this case, Hall alleges that Arnett was physically present and personally observed Berry-Loucks' actions. The allegations in the Complaint, if true, would be sufficient to establish that Arnett observed the use of excessive force while it occurred. Regarding Berry-Loucks' acts of striking the plaintiff across the face, however, the plaintiff does not allege facts suggesting that Arnett had either the opportunity or means to prevent that harm from occurring. The Complaint indicates that these blows occurred rapidly and without advance warning.

Having witnessed them, however, Arnett was arguably put on notice that Berry-Loucks was acting unreasonably and unprofessionally. Arnett was close by, and she allegedly witnessed Berry-Loucks call Hall a "bitch" and push her face-down onto the bed. These allegations strongly imply that Arnett had both the opportunity and the means at that point to intervene and prevent further harm from occurring. The plaintiff does not indicate precisely how long the alleged sexual assault took place, but the facts as alleged in the Complaint, if believed to be true, would permit a reasonable jury to conclude that Arnett had a responsibility—but failed—to intervene to prevent further harm.

Arnett argues that, because the allegations are based "upon information and belief" rather than facts, they do not qualify as allegations of fact necessary to support claims for relief. In this instance, however, the plaintiff does allege as a factual matter that Arnett was in the bedroom and witnessed the events unfold. The facts of Arnett's presence and proximity support the plaintiff's "belief" and explain why she holds it. Accordingly, under the specific circumstances presented here, the plaintiff's use of the words "upon information and belief" does not defeat her claims. The facts in the Complaint support the inference that Arnett violated the plaintiff's constitutional rights by failing to intervene.

The next question is whether Arnett is entitled to qualified immunity. She argues that "it was not clearly established that merely being in the same room as another officer who allegedly uses excessive force and conducts a purportedly unreasonable search could subject [her] to Section 1983 liability for failure to intervene." (Doc. No. 10, at 12.) To the contrary, it appears to have been well established in the Sixth Circuit, at the time of the plaintiff's arrest, that a police officer could be liable for "failing to intervene or for failing to protect [an arrestee] from another officer's use of excessive force," if the plaintiff shows that "the officer observed or had reason to

know that excessive force would be or was being used and that the officer had both the opportunity and the means to prevent the harm from occurring." *Smith v. City of Troy, Ohio*, 874 F.3d 938, 945–46 (6th Cir. 2017) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Other circuits have also recognized the failure to intervene as a basis for liability under a Fourth Amendment excessive force claim. *See, e.g.*, *Estate of Booker v. Gomez*, 745 F.3d 405, 423 (10th Cir. 2014) (denying summary judgment on qualified immunity grounds on the basis that an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force "can be held liable for his nonfeasance"); *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009) ("As of June 2007, it was clearly established that an officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment."); *Torres–Rivera v. O'Neill–Cancel*, 406 F.3d 43, 51–52 (1st Cir. 2005) (affirming jury instructions on the law governing a police officer's failure to intervene).

The excessive force claim against Arnett, premised upon a failure to intervene, will not be dismissed at this juncture.

### B.      Civil Assault and Battery

To the extent the plaintiff intended to state assault and battery claims against Winkler, the factual allegations in the Complaint do not support such claims, again because Winkler is not alleged to have had any direct contact with Hall.

Regarding Arnett, Tennessee law seems clear that the tort of battery requires "any intentional, unlawful, and harmful [*or offensive*] physical contact by one person with another person." *Lacy v. Hallmark Volkswagen Inc. of Rivergate*, No. M2016-02366-COA-R3-CV, 2017 WL 2929502, at *4 n.5 (Tenn. Ct. App. July 10, 2017) (alteration in original) (quoting 8 Tenn.

Prac. Pattern Jury Instr. T.P.I.–Civ. 8.02 (2014 ed.)). Because Hall does not allege actual physical contact between her and Arnett, the Complaint fails to state a battery claim against Arnett.

Assault, under Tennessee law, consists of two elements:

1. An intentional attempt or the unmistakable appearance of an intentional attempt to do harm to, or to frighten, another person; and

2. The present ability or the unmistakable appearance of the present ability to do that harm or to cause that fright.

*Id.* (quoting 8 Tenn. Prac. Pattern Jury Instr. T.P.I.–Civ. 8.01). The plaintiff does not allege threatening conduct on the part of Arnett. She simply alleges that Arnett was present and observed Berry-Loucks' use of excessive force. The Complaint therefore fails to state an assault claim against Arnett either.

### C.      False Arrest and False Imprisonment

The Complaint states:

39. Defendant Arnett knowingly and deliberately, or with a reckless disregard for the truth, completed three arrest warrant affidavits charging Ms. Hall with a Felony Drug Offense, Possession of a Firearm w/ Intent, and Criminal Simulation.

40. Defendant Winkler knowingly and deliberately, or with a reckless disregard for the truth, completed three additional arrest warrant affidavits charging Ms. Hall with Possession of a Legend [sic] drug without a Prescription, Unlawful Use of Drug Paraphernalia, and Theft of Merchandise. Defendant Winkler's arrest warrant affidavit for Unlawful Use of Drug Paraphernalia did not charge Ms. Hall with possession of a syringe.

41. All criminal charges against Ms. Hall were subsequently dismissed in Davidson County Criminal Court.

(Compl. ¶¶ 39-41.) This is the entirety of the factual support for the false arrest and false imprisonment claims against Arnett and Winkler. Hall does not state when the arrest warrants were sworn out, but her assertion that Winkler's affidavit did not reference the syringe concealed

in her bra and her response to Arnett and Winkler's Motion to Dismiss indicate that they were sworn out after the plaintiff had already been arrested and taken into custody.

Notably, Hall does not identify the *factual* allegations set forth in the arrest warrant affidavits to support the referenced charges, show that these facts were false, or plausibly allege that the defendants knew or recklessly disregarded the truth of such facts. Moreover, she does not assert that either Arnett or Winkler participated in the plaintiff's initial arrest and detention upon her arrival at her apartment on the morning of August 16, 2016.

The legal standards governing false arrest claims are set forth above. Based on those standards, the court finds, first, that Hall fails to allege that either Arnett or Winkler was an "arresting officer" and therefore cannot establish a false arrest claim against them, under federal or state law, based on her initial detention. Second, because the Complaint does not allege with any particularity that there were untrue *factual* assertions in the arrest warrant affidavits sworn out by Arnett and Winkler after the plaintiff had already been taken into custody, the Complaint fails to state a claim against either defendant based on the statements in the arrest warrant affidavits.

Finally, even if the Complaint could be construed as showing that the arrest warrant affidavits contained untrue factual statements, the evidence in the possession of the Metro Police Officers by that time, including the fact that Hall was found to be concealing drug paraphernalia in her bra and that numerous individuals in possession of drugs and/or paraphernalia were arrested at her home, provided probable cause to charge the plaintiff with drug-related crimes. Tennessee law defines drug paraphernalia as "all equipment, products and materials of any kind which are used, intended for use, or designed for use in . . . injecting, ingesting, inhaling or otherwise introducing into the human body, a controlled substance." Tenn. Code Ann. § 39-17-

402(12). The statute does not require the paraphernalia to actually have been used for possession of it to be a crime. *See State v. Sullivan*, No. 02C01-9803-CC-00071, 1999 WL 134981, at \*4 (Tenn. Crim. App. Mar. 15, 1999) (finding that a syringe found in a bathroom adjoining a room where drugs were recovered was "sufficient evidence for a rational trier of fact to find both Defendants guilty of possession of drug paraphernalia pursuant to [Tenn. Code Ann. §] 39-17-425"). In other words, probable cause existed to arrest the plaintiff for unlawful possession of drug paraphernalia in connection with the syringe found in her bra. In addition, it appears there would have been probable cause to charge Hall in connection with the other drugs and paraphernalia located in her apartment. *See id.* at \*3 ("Having possession of the premises where contraband is found creates an inference that the possessor had possession of the contraband." (citing *Armstrong v. State*, 548 S.W.2d 334, 336 (Tenn. Crim. App. 1976))).

Generally, "an arrest warrant must be supported by probable cause to comply with the Fourth Amendment." *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996). Thus, it is a violation of the Fourth Amendment for an arrest warrant affiant to "knowingly and deliberately, or with a reckless disregard for the truth, ma[k]e false statements or omissions that create a falsehood," where "such statements or omissions are material, or necessary, to the finding of probable cause." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010). However, if probable cause is still present despite deficiencies in the warrant, no Fourth Amendment violation has occurred. *See id.* ("If the affidavit contains false statements or material omissions, we set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause."); *United States v. Barone*, 584 F.2d 118, 121 (6th Cir. 1978) ("[E]ven in such an instance of perjury, the warrant will be voided only if the false

statement is necessary to establish probable cause.").[2] Finally, probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause. *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 682 (7th Cir. 2007) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). Because there was probable cause to believe the plaintiff was in possession of drug paraphernalia, her false arrest and false imprisonment claims against Arnett and Winkler fail.

### D.    Malicious Prosecution

The plaintiff also brings malicious prosecution claims against Arnett and Winkler based on the arrest warrant affidavits. The Sixth Circuit recognizes that "a plaintiff may bring a malicious prosecution claim under the Fourth Amendment based on a defendant officer's wrongful investigation, prosecution, conviction, and incarceration of a plaintiff." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (citing *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006)). For a police officer to incur liability for malicious prosecution, the plaintiff must show that

> (1) a criminal prosecution was initiated against her and [the police officer] made, influenced, or participated in the prosecution decision; (2) there was no probable cause to support the charges; (3) as a result of the legal proceedings, [the plaintiff] suffered a deprivation of liberty "apart from the initial seizure"; and (4) the criminal proceedings ended in [the plaintiff's] favor.

*Id.* (quoting *Sykes*, 625 F.3d at 308–09). An officer who makes "misrepresentations and omissions" on an application for an arrest warrant and investigative report, which are relied on

---

[2] The Supreme Court recognizes that not every fact "recited in the warrant [will] necessarily [be] correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Franks v. Delaware*, 438 U.S. 154, 165 (1978)

by prosecutors in proceeding against a plaintiff, may be deemed to have influenced or participated in the prosecution decision. *Id.* (citing *Sykes*, 625 F.3d at 314–17).

Similarly, a malicious prosecution claim under Tennessee law requires a showing that (1) a criminal proceeding has been instituted by the defendants against the plaintiff; (2) such proceeding terminated in favor of the plaintiff; (3) there was an absence of probable cause; and (4) the defendant acted with malice or "a primary purpose other than that of bringing the offender to justice." *Gordon v. Tractor Supply Co.*, No. M2015-01049-COA-R3-CV, 2016 WL 3349024, at *5 (Tenn. Ct. App. June 8, 2016) (quoting *Smith v. Harford Mut. Ins. Co.*, 751 S.W.2d 140, 143 (Tenn. Ct. App. 1987)).

The Complaint does not affirmatively allege or show that Arnett or Winkler made misrepresentations or omissions, because, again, the Complaint does not contain any information about the factual content of the warrant affidavits. The Complaint does not allege facts suggesting that Arnett and Winkler acted with malice or that they made, influenced, or participated in the prosecution decision. As set forth above, there was probable cause to arrest the plaintiff on drug paraphernalia charges. And the plaintiff does not allege that she suffered a deprivation of liberty apart from the initial seizure. Hall states that, after the alleged assault by Berry-Loucks, she was transported to Nashville General Hospital, where she was interviewed about the assault and given a sexual assault examination. (Compl. ¶ 34.) There is no indication that her detention was extended as a result of Arnett's and Winkler's arrest warrant affidavits. The court therefore finds that the Complaint fails to allege sufficient facts to state a colorable malicious prosecution claim under either federal or state law.

### E.    Summary: Arnett and Winkler's Motion to Dismiss

All claims against Arnett and Winkler will be dismissed for failure to state a claim for

which relief may be granted, *except* the excessive force claim against Arnett under 42 U.S.C. § 1983.

## VI.    Metro's Motion to Dismiss

Based on the allegations in the Complaint and the framing of the causes of actions asserted therein, it appears that the plaintiff intends to bring municipal liability claims against Metro under 42 U.S.C. § 1983 and state law claims under the Tennessee Governmental Tort Liability Act ("TGTLA") based on the actions of the individual defendants.

### A.    Municipal Liability Under § 1983

Metro seeks dismissal of all § 1983 claims against it. It argues that (1) the Fifth, Eight, and Fourteenth Amendments do not apply to any of Hall's claims; and (2) the Complaint fails to articulate factual allegations sufficient to support any § 1983 claims against Metro. It argues that the Complaint contains only conclusory statements unsupported by well pleaded factual allegations. In response, the plaintiff insists that the Complaint adequately alleges that it is "the custom, usage, practice or procedure of the Metropolitan Nashville Police Department to act in the unlawful manner described in the recitation of facts" and that these allegations are sufficient to establish municipal liability pursuant to § 1983. (Doc. No. 22, at 5.)

The court has already found, above, that Hall's claims are governed exclusively by the Fourth Amendment. To the extent that she intended to state claims under § 1983 based on violations of any other constitutional amendments, such claims are subject to dismissal. The court also finds, as set forth below, that the Complaint fails to state a claim against Metro under the Fourth Amendment for which relief may be granted.

To plead a claim for municipal liability under § 1983, Hall must plausibly allege that her constitutional rights were violated and that a policy or custom of Metro was the "moving force"

behind the deprivation of her rights. *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254–55 (6th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (citation omitted). Because the other claims have been dismissed, the only "deprivation of rights" at issue here is the purported use of excessive force by Berry-Loucks and Arnett's failure to intervene.

As this court has previously recognized, there are effectively four ways to establish municipal liability under § 1983:

> [1] Plaintiff can challenge the official action of a municipal legislative body, agency, or board; [2] a policymaking decision by an individual with final decision-making authority; [3] Metro's deliberately indifferent failure to screen, train, or supervise its employees; or [4] Metro's deliberate indifference to a clear and persistent pattern of illegal activity (a "custom") about which Metro policymakers knew or should have known.

*Okolo v. Metro. Gov't of Nashville*, 892 F. Supp. 2d 931, 941 (M.D. Tenn. 2012) (Sharp, J.) (citing *Monell*, 436 U.S. at 694; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989); *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005)).

The plaintiff here does not seek to challenge any official action by the municipality or an express policymaking decision. Rather, her claims hinge upon allegations that Metro was deliberately indifferent in its hiring, training, and supervision of Metro police officers and that it was deliberately indifferent to a pattern of illegal activity, amounting to a custom, of which Metro knew or should have known.

### 1. Deliberate Indifference to an Unconstitutional Custom

"The question here is whether there was some sort of policy, custom, or practice in the Metro Police Department of condoning excessive force, and . . . such a policy must be shown by a clear and persistent pattern." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005). That is, to hold Metro liable for its officers' unconstitutional actions under a "custom"

theory, Hall "must show that Metro has (1) an unwritten custom (2) of remaining deliberately indifferent (3) to a clear and persistent pattern of illegal uses of force and seizures (4) that it knew or should have known about." *Okolo*, 892 F. Supp. 2d at 941–42 (citing *Thomas*, 398 F.3d at 433).

The Complaint in this case alleges that Metro "implicitly or explicitly adopted and implemented careless and reckless policies, procedures, customs, or practices" that authorized Metro police officers "to perform 'on-scene cavity searches' upon the citizenry of Nashville" and, more generally, to use "excessive and unwarranted force" in the course of performing their duties. (Compl. ¶¶ 43, 52.). It asserts that Metro "knew or should have known" that "one or more" of the individual defendants had previously engaged in unwarranted cavity searches and that Metro police officers "routinely" engaged in the use of excessive force" (Compl. ¶¶ 44–45, 53) but failed to take action to prevent such activity (Compl. ¶ 46; *see also id.* ¶ 63(i)–(iv)), and that "[a]s a direct and proximate result of the policies, procedures, customs, and actions of the Defendants, the Plaintiff suffered deprivations of [her] constitutional rights." (Compl. ¶ 70.)

Hall has not stated a viable claim under a custom theory of municipal liability. The allegations in the Complaint amount to no more than a "formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555. Although the assertion that one or more of the individual defendants had engaged in similar unauthorized "cavity searches" on previous occasions is couched as a factual allegation, the Complaint contains no well pleaded facts to support a conclusion that Metro was on notice of a pattern or practice of unconstitutional uses of force by its officers. *Accord Okolo v. Metro. Gov't of Nashville*, 892 F. Supp. 2d 931, 942 (M.D. Tenn. 2012) ("The conclusory statement that Metro was 'aware of illegal arrests being made by its officers' is a blanket assertion of the type proscribed by *Twombly*. Plaintiff fails to plead a

'clear and persistent pattern of illegal uses of force and seizures.'"); *Hutchison v. Metro. Gov't of Nashville & Davidson Cnty.*, 685 F.Supp.2d 747, 751 (M.D. Tenn. 2010) (holding that, without supporting factual assertions, the plaintiff's claim that Metro has a custom, policy, or practice of stopping vehicles and illegally ordering disabled passengers to exit must be dismissed). In the absence of plausible allegations of "a clear and persistent pattern of illegal uses of force and seizures," the plaintiff also fails to show Metro was aware of, and remained deliberately indifferent to, such uses of force.

### 2. *Deliberate Indifference in Hiring, Training and Supervision*

The plaintiff's claim that Metro was deliberately indifferent in its hiring decisions is readily disposed of. To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability in violation of *Monell*, the court "must carefully test the link between" Metro's allegedly inadequate hiring decision and Berry-Loucks' alleged use of excessive force. *Bd. of Cnty. Commissioners v. Brown*, 520 U.S. 397, 410 (1997). "Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be a deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'" *Id.* at 411. The Complaint contains absolutely no facts concerning Metro's decisions to hire Berry-Loucks or any other police officer. There is no factual underpinning from which a conclusion could plausibly be drawn that there was anything in the backgrounds of the police officers to alert Metro that hiring them would result in the deprivation of a citizen's constitutional rights and that Metro was deliberately indifferent to the risk posed. *Accord Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*, No.

3:10-0589, 2010 WL 3619790, at *3–4 (M.D. Tenn. Sept. 13, 2010) (Campbell, J.) (dismissing hiring-related § 1983 claim).

Regarding the failure-to-train claim, "[a] systematic failure to train police officers adequately is a custom or policy which can lead to municipal liability." *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006) (citing *City of Canton*, 489 U.S. at 388). Under a "failure to train" theory of municipal liability, the plaintiff must show that (1) a training program is inadequate to the tasks that the officers must perform; (2) the inadequacy is the result of Metro's deliberate indifference; and (3) the inadequacy is closely related to or actually caused the plaintiff's injury. *Okolo*, 892 F. Supp. 2d at 942 (citing *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)).

To state a claim of deliberate indifference in the context of a failure to train claim, the plaintiff must allege "prior instances of unconstitutional conduct demonstrating that the [municipality] had notice that the training was deficient and likely to cause injury but ignored it," or, in the absence of evidence of prior instances, "that the [municipality] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 562–63 (6th Cir. 2011) (internal citations omitted). Deliberate indifference based on a single violation of rights requires "a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Id.* at 567 (citing *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)).

Claims of inadequate supervision or discipline are treated as failure to train claims. They require a showing of more than "a mere failure to act. Rather, the supervisors must have actively engaged in unconstitutional behavior." *Gregory v. City of Louisville*, 444 F.3d at 751 (6th Cir.

2006). The plaintiff must allege that Metro was deliberately indifferent to a history of widespread abuse. *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994).

The Complaint includes the following very general allegations concerning Metro's failure to train or supervise:

> The failure of the City of Nashville to adequately implement and enforce policies and procedures, train and /or supervise the Individual Defendants amounts to deliberate indifference to the rights of the Plaintiff to be free from excessive force and unreasonable searches.

 (Compl. ¶ 48.)

> The City of Nashville knew or should have known that, in the absence of a reasonable procedure, policy, training or supervision to deter police officers from using excessive and unwarranted force, civilians including Plaintiff would be subject to unlawful assaults . . . and/or excessive force during detentions.

(Compl. ¶ 55.)

> The failure of the City of Nashville to adequately . . . train or supervise the Individual Defendants amounts to deliberate indifference . . . .

(Compl. ¶ 56.)

> The failure of the Defendant City of Nashville to hire, adequately train and/or supervise Metro-Nashville Police Department personnel . . . is derived from inadequate and constitutionally deficient hiring procedures, training procedures, and procedures involving the investigation of complaints against and discipline of Metro-Nashville police officers, and said failure amounts to a deliberate indifference to the rights of persons with whom Metro-Nashville police officers come into contact.

(Compl. ¶ 64.)

Again, the court does not accept as true these formulaic recitations and conclusory statements. They are not supported by actual facts. Even if the court assumes that Berry-Loucks and Arnett received inadequate training and supervision on the use of force during arrests and detentions, the Complaint includes no well-pleaded factual allegations of a department-wide failure to train on the use of force or appropriate searches. The Supreme Court has confirmed

that § 1983 claims must conform to the same pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure applicable to other types of claims. *See, e.g.*, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168–69 (1993). Since *Leatherman*, however, the Supreme Court has clarified the Rule 8(a) pleading standard, holding that, to survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In short, to establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action"; instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The plaintiff did not cross that line in this case, and the § 1983 claims against Metro must be dismissed for failure to state a claim for which relief may be granted.

### B. The TGTLA

Generally speaking, the state of Tennessee and governmental entities—including municipalities like Metro—enjoy immunity from suit. The TGTLA, however, removes the immunity of governmental entities "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment." Tenn. Code Ann. § 29-20-205. The court has determined that all claims against the individual defendants are subject to dismissal except the excessive force and assault and battery claims against Berry-Loucks and the excessive force claim against Arnett.

The TGTLA specifically preserves immunity from suits involving injuries that arise out of "civil rights." Tenn. Code Ann. § 29-20-205(2). Metro therefore cannot be liable under the

TGTLA based on the excessive force claims against Berry-Loucks or Arnett.

The Tennessee Supreme Court has recognized that assault and battery are not included in the enumerated list for which immunity is preserved and, therefore, that "a governmental entity, under appropriate circumstances, [can] be held liable for an assault and battery by an employee" under the TGTLA. *Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 368 (Tenn. 2011) (citing *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 83 (Tenn. 2001)). However, such "appropriate circumstances" exist only if the plaintiff can make a "direct showing [of] negligence on the part of the governmental entity," typically negligent supervision. *Id.* (citations omitted). "When, therefore, there has been no showing of negligence by the governmental entity in [the] supervision of one of its employees acting within the scope of employment, the exception to sovereign immunity set forth in section 29-20-205 will not apply" to assault and battery claims. *Id.* at 368–69.

The Complaint in this case makes only vague assertions that the "agents, servants, and/or employees of the City of Nashville were negligent by permitting the improper use of force upon the Plaintiff on August 15, 2016 . . . and said negligence was committed within the scope of the employment of the agents, servants, and/or employees of the City of Nashville." (Compl. ¶ 81; s*ee also* Compl. ¶¶ 43, 55.) It does not contain any plausible factual allegations affirmatively demonstrating negligent supervision by Metro. The mere fact that an employee engaged in the use of excessive force does not give rise to an inference that Metro was negligent in supervising her.

The TGTLA claims are, therefore, subject to dismissal in their entirety.

## VII.    Conclusion

For the reasons set forth herein, Metro's and Aaron's Motions to Dismiss (Doc. Nos. 5, 7) will be granted in their entirety, and the claims against those defendants will be dismissed. Berry-Loucks' Motion to Dismiss (Doc. No. 12) will be granted in part and denied in part. The Complaint adequately alleges facts supporting a § 1983 claim against Berry-Loucks based on violations of the plaintiff's Fourth Amendment rights as well as state-law assault and battery claims. All other claims against Berry-Loucks are subject to dismissal. Arnett and Winkler's joint Motion to Dismiss (Doc. No. 9) will be granted in part and denied in part. Specifically, all claims against Winkler are subject to dismissal, and all claims against Arnett must be dismissed *except* the § 1983 claim against her in her individual capacity, based on her failure to intervene to prevent or stop Berry-Loucks' use of excessive force and an unreasonable search of Hall, in violation of Hall's rights under the Fourth Amendment.

An appropriate Order is filed herewith.

ENTER this 5th day of January 2018.

ALETA A. TRAUGER
United States District Judge